SECURITIES INVESTOR PROTECTION CORPORATION, Plaintiff–Appellant,

v.

Seymour VIGMAN, et al., Defendants,

and

Robert G. Holmes, Jr., Defendant–Appellee.

Eugene W. BELL, Trustee for the liquidation of Joseph Sebag Incorporated ("Bell"); Laurence A. Schroeder, Successor Trustee for the Liquidation of First State Securities Corporation ("Schroeder"), Plaintiffs–Appellants,

v.

Seymour VIGMAN, et al., Defendants,

and

Robert G. Holmes, Jr., Defendant–Appellee.

Nos. 89–55094, 89–55128.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 6, 1990.

Decided Aug. 3, 1990.

---

G. Robert Blakey, Notre Dame Law School, Notre Dame, Ind., Stephen C. Taylor, Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., and C. Edward Simpson, Jones, Bell, Simpson & Abbott, Los Angeles, Cal., for plaintiffs-appellants.

Jack I. Samet, Buchalter, Nemer, Fields & Younger, Los Angeles, Cal., for defendant-appellee.

Daniel L. Goelzer, Gen. Counsel, Paul Gonson, Solicitor, Jacob H. Stillman, Assoc. Gen. Counsel, Thomas L. Riesenberg, Asst. Gen. Counsel, Lucinda O. McConathy, Senior Sp. Counsel, Robert L. McCloskey, Securities and Exchange Com'n, Washington, D.C., for amicus curiae.

Before SCHROEDER, THOMPSON and TROTT, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

The district court granted summary judgment in favor of defendant Holmes in this suit brought by the Securities Investor Protection Corporation ("the SIPC") and trustees of defunct stock brokerage firms. The SIPC and the trustees sued to recover losses allegedly sustained as a result of a conspiracy to manipulate the prices of stocks of publicly traded corporations. The district court concluded that the SIPC did not have standing to assert a claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 ("RICO"), when that claim was based on alleged securities violations under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.[1] The district court also determined that the defendant Holmes' acts viewed separately from those of the other alleged coconspirators were not the proximate cause of the losses sustained. We have jurisdiction under Fed.R.Civ.P. 54(b) and 28 U.S.C. § 1291 and we reverse.

## FACTS

In 1970, Congress established the SIPC pursuant to the Securities Investor Protection Act, codified as amended at 15 U.S.C. § 78aaa–78lll. The SIPC was created in the wake of the collapse of numerous brokerage houses. It was created to provide greater protection to customers of brokers and dealers and members of national securities exchanges.

The SIPC is a nonprofit corporation. Its membership consists of most registered brokers and dealers. 15 U.S.C. § 78ccc(a). It has the power "to sue and be sued, complain and defend, in its corporate name and through its own counsel, in any State, Federal, or other court." 15 U.S.C. § 78ccc(b)(1). The SIPC also has the power to apply for a protective decree from a court of competent jurisdiction and to seek the appointment of a trustee for the liquidation of a broker-dealer member's business when a broker-dealer member fails or

---

**1.** Section 10(b), 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5.

is in danger of failing to meet obligations to customers. 15 U.S.C. § 78eee.

In late July 1981, the SIPC instituted liquidation proceedings against two securities brokerages, First State Securities Corp. ("FSSC") and Joseph Sebag, Inc. ("Sebag"). John L. Britton was appointed trustee for the liquidation of FSSC,[2] and Eugene W. Bell was appointed trustee for the liquidation of Sebag (collectively, "the trustees"). In the process of liquidating the brokerages, the SIPC alleges it had to disburse nearly $13 million to meet customers' claims for which the brokerages' assets were insufficient.

In July 1983, the SIPC and the trustees filed an action in federal district court against seventy-five defendants, alleging securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder; a conspiracy under RICO; common law fraud; and breach of fiduciary duty. The SIPC and the trustees alleged in their complaint that from 1964 through July 1981 the defendants engaged in a scheme to manipulate the stock of six companies traded in the over-the-counter market,[3] and that the defendants used FSSC and Sebag as vehicles in furtherance of this scheme. The defendants are officers and directors of the six companies and former principals and employees of FSSC and Sebag.

The SIPC and the trustees allege that the defendants misrepresented the six companies' prospects through statements by company officials, press releases, and financial statements. An illusion of active markets in the six stocks was allegedly maintained by misleading transactions in the defendants' accounts, in the brokerages' proprietary accounts, and in the accounts of unsuspecting customers. When the alleged scheme was uncovered, the prices of the stocks fell drastically. Because FSSC and Sebag held large amounts of the stocks in their proprietary accounts, they incurred heavy losses, leading to the liquidation proceedings.

The present appeal is the third to reach this court in this litigation. In *Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309 (9th Cir.1985), the district court dismissed four defendants for lack of personal jurisdiction and improper venue. As to lack of personal jurisdiction, we reversed the dismissal of one defendant and remanded the dismissal of another for further consideration. *Id.* at 1316. We also remanded for further proceedings the district court's dismissal of these two defendants on the ground of improper venue. *Id.* at 1318. In *Securities Investor Protection Corp. v. Vigman*, 803 F.2d 1513, 1519–20 (9th Cir.1986), we reversed the dismissal of the SIPC's 10–b5 claims.

Robert G. Holmes, Jr., the only defendant involved in this appeal, is the founder, the chief executive officer, the president, and a major shareholder of Aero Systems, Inc. ("Aero"), one of the six companies whose stock was allegedly manipulated. Holmes also was a shareholder in Bunnington Corp. ("Bunnington"), another one of the six companies, during the period of the alleged manipulation. The SIPC and the trustees allege that Holmes participated in a conspiracy with certain other defendants to manipulate the price of Aero and Bunnington stock. They allege that Holmes issued false and misleading press releases and other public statements regarding a new product Aero was marketing to inflate artificially the price of Aero's stock. Further, they assert that Holmes helped other defendants manipulate the price of Bunnington's stock by purchasing large blocks of Bunnington stock and then selling in small lots, thus creating the appearance of an active trading market. Finally, the plaintiffs allege that Holmes helped conceal FSSC's poor financial position by allowing FSSC to "park"[4] shares of Bunnington stock in Holmes' trading account.

---

**2.** Laurence A. Schroeder is currently the successor trustee for the liquidation of FSSC.

**3.** The companies are Aero Systems, Inc., Aerosonics Corp., Bunnington Corp., Creditbank,

Inc., Dash Industries, Inc., and Osrow Products Corp.

**4.** "Parking" is a mechanism used to evade the net capital requirements of the National Association of Securities Dealers ("NASD"). When a

Holmes moved for summary judgment, asserting that the SIPC lacked standing to assert a RICO claim because the SIPC was not a purchaser or seller of securities. Holmes also contended that any conduct he engaged in did not cause the losses which the SIPC and the trustees sustained.

The district court granted Holmes' motion for summary judgment. The district court concluded that genuine issues of material fact existed as to the elements of the RICO claim, including whether Holmes conspired to violate RICO, but it concluded that the SIPC did not meet the purchaser-seller requirement for standing to assert a RICO claim predicated upon violations of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5.

The district court also concluded that a genuine issue of material fact existed as to whether Holmes' acts, upon which the RICO claim was based, were the *actual cause* of the losses to the SIPC and the trustees, but that there was no genuine issue for trial to dispute the fact that Holmes' acts were not the *proximate cause* of the losses. The district court reached its proximate cause conclusion by isolating Holmes' acts from the acts of other members of the alleged conspiracy, and by applying a "loss causation" requirement to the RICO claim.

## DISCUSSION

This court reviews de novo a grant of summary judgment, viewing the evidence in the light most favorable to the party against whom it was granted. *Franklin v. Murphy*, 745 F.2d 1221, 1235 (9th Cir.1984). Summary judgment is proper if "there is

no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### A. Purchaser–Seller Standing Limitation

The SIPC argues that it need not have been a purchaser or seller of securities to have standing to bring a RICO claim based on predicate acts of securities fraud.[5] The SIPC urges us not to apply to its RICO claim the purchaser-seller standing limitation applicable to a Rule 10b–5 claim. *See Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 463–64 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), a 10b–5 case, the Supreme Court adopted the *Birnbaum* rule. It held that, to bring a Rule 10b–5 private damages action, a plaintiff must be a purchaser or seller of securities. *Blue Chip Stamps*, 421 U.S. at 754–55, 95 S.Ct. at 1334–35. In a previous appeal in this litigation, we held that the SIPC has standing to assert Rule 10b–5 claims to the extent it can show FSSC and Sebag used customer assets without authorization to purchase or sell securities. *Securities Investor Protection Corp. v. Vigman*, 803 F.2d at 1519.

brokerage firm files the required monthly report with the NASD regarding its net capital condition, it must discount in value any stock it holds in its own account (referred to as a "haircut"). To reach technical compliance with its net capital requirements, a brokerage firm "sells" stock from the brokerage's own account to a customer at market price. This avoids the discount for reporting purposes. Once the brokerage firm has filed its report with the NASD and met its net capital requirement, the firm "buys" the shares back from the customer, usually at the same price at which it sold the stock plus interest.

The SIPC and the trustees allege that Holmes conspired with FSSC to park shares of Bunnington in Holmes' account to allow FSSC to mask net capital deficiencies in its reports to the NASD. This allegedly allowed FSSC to continue its participation in the overall manipulation conspiracy.

5. Holmes does not challenge the trustees' standing to bring a RICO claim. He challenges only the SIPC's standing to bring such a claim.

To determine whether the purchaser-seller standing limitation of a 10b–5 claim also applies to a RICO claim when the RICO claim is based on acts of securities fraud, we first look to RICO's text (*see United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)) and compare that text to Rule 10b–5.

Section 1962(a) of RICO provides:

> It shall be unlawful for any person who has received any income derived ... from a pattern of racketeering activity ... to use or invest ... any part of such income ... in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). "Racketeering activity" includes acts of "fraud in the sale of securities" and of mail fraud and wire fraud. 18 U.S.C. § 1961(1). Section 1964 provides:

> Any person injured in his business or property by reason of a violation of section 1962 ... may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains....

18 U.S.C. § 1964(c).

On its face, the RICO statute has no purchaser-seller standing requirement. Any plaintiff who is injured "by reason of" fraud in the sale of securities may sue. *See Warner v. Alexander Grant & Co.*, 828 F.2d 1528, 1530 (11th Cir.1987). Thus, even though the predicate acts of a RICO claim may be based on allegations of fraud in the sale of securities, the RICO text does not require a plaintiff to be a purchaser or seller, so long as the plaintiff suffered injury "by reason of" the alleged fraud. In contrast, for conduct to be unlawful under Rule 10b–5, it must have occurred "in connection with the purchase or sale of any security." Rule 10b–5, 17 C.F.R. § 240.10b–5.

In addition to this textual difference between RICO and Rule 10b–5, the source of the civil remedy for violations of the two are different. RICO contains its own express civil action remedy. Neither section 10(b) of the Securities Exchange Act of 1934 nor Rule 10b–5 contains an express civil remedy for a securities fraud violation. That remedy has been implied by the courts. *See Blue Chip Stamps*, 421 U.S. at 730, 95 S.Ct. at 1922 (citing *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971), and *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 150–54, 92 S.Ct. 1456, 1470–72, 31 L.Ed.2d 741 (1972)). The remedy of a private civil action under Rule 10b–5 having been court created, the Court has not been reluctant to limit the class of plaintiffs who may bring such a private action. *Blue Chip Stamps*, 421 U.S. at 749, 95 S.Ct. at 1931. And it has limited that class to purchasers or sellers of securities. *Id.* at 730–31, 95 S.Ct. at 1922–23.

With regard to the RICO statute, however, the private civil action for violation of it was not created by the courts, but by Congress in enacting the statute. The RICO statute contains no limitation that a plaintiff must be a purchaser or seller of a security, and it is not appropriate for this court to impose such a limitation. *Cf. Blue Chip Stamps*, 421 U.S. at 748–49, 95 S.Ct. at 1930–31 ("[I]f Congress had legislated the elements of a private cause of action for damages, the duty of the Judicial Branch would be to administer the law which Congress enacted; the Judiciary may not circumscribe a right which Congress has conferred because of any disagreement it might have with Congress about the wisdom of creating so expansive a liability."). And, as the Supreme Court has stated,

> RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes."

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985) (citation omitted) (quoting RICO, Pub.L. No. 91–452, § 904(a), 84 Stat. 947).

We hold that the purchaser or seller standing limitation that applies to 10b–5 actions does not apply to RICO claims based upon predicate acts that are alleged to be securities fraud under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. Accordingly, the SIPC has standing to assert its RICO claim. We now consider the district court's ruling on causation.

## B. *Causation*

■ The district court determined that in order for the SIPC and the trustees to succeed on their RICO claim against Holmes, they had to show that Holmes' acts were the proximate cause of the harm they suffered. In analyzing this causation question, the district court determined that proximate cause had not been established because the SIPC and the trustees had failed to show "loss causation" to connect Holmes' acts to the losses sustained.

We defined "loss causation" in the context of Rule 10b–5 in *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 (9th Cir.1984). There we said that "in an action brought under Rule 10b–5 for material omissions or misstatements, the plaintiff must prove both transaction causation, that the violations in question caused the plaintiff to engage in the transaction, and loss causation, that the misrepresentations or omissions caused the harm." *Id.* Having stated the "loss causation" requirement as it pertains to a Rule 10b–5 case, we then went on to hold in *Hatrock* that the plaintiffs did not have to establish "loss causation" because their claim was predicated upon allegations that the defendant broker churned securities in their account to generate commissions. *Id.* at 773–74. Thus, although the plaintiffs still had to prove a causal connection between the defendant's acts and their losses, the trial court had not erred in failing to instruct the jury on "loss causation." *Id.* at 774 & n. 5.

In *Hatrock*, we cited *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), as the source of our definitions of "loss causa-

tion" and "transaction causation." *Schlick* was

> not a case where the 10b–5 claim [was] based solely upon material omissions or misstatements in the proxy materials. Were it so, concededly there would have to be a showing of both *loss causation*—that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the appellant to engage in the transaction in question. The former is demonstrated rather easily by proof of some form of economic damage, here the unfair exchange ratio, which arguably would have been fairer had the basis for valuation been disclosed. Transaction causation requires substantially more. In a misrepresentation case, to show transaction causation a plaintiff must demonstrate that he relied on the misrepresentations in question when he entered into the transaction which caused him harm.

*Id.* (footnote omitted). The *Schlick* Court pointed out that the 10b–5 claim before it was based upon allegations "of a scheme to defraud which includes market manipulation and a merger on preferential terms, of which the proxy omissions and misrepresentations were only one aspect. Thus appellant need only show loss causation [and not transaction causation as well] with respect to his claim for relief under 10b–5." *Id.* at 381 (footnote omitted).

We turn now to the question whether the SIPC and the trustees must show "loss causation" to support their RICO claim, a claim which is based on predicate acts of securities fraud under the Securities Exchange Act of 1934 and Rule 10b–5. Given the analysis in *Hatrock* and *Schlick*, it would appear that they do. But this does not mean that "loss causation" is some additional requirement which must be shown over and above "proximate cause." Rather, "loss causation" is simply a label used to describe the standard rule of tort law that a plaintiff must allege and prove a sufficient causal connection between the defendant's wrongdoing and the plaintiff's harm. *See Bastian v. Petren Resources Corp.*, 892 F.2d 680, 686 (7th Cir.), *cert.*

*denied,* —— U.S. ——, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990) ("'loss causation' is an exotic name—perhaps an unhappy one,[6] ... for the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains."). *Id.* at 685.

We conclude that the SIPC and the trustees must establish a causal connection between the alleged predicate acts of securities fraud and the losses they seek to recover. But in doing so, they need satisfy only the requirements of proximate cause as understood in a typical tort claim. *See Bastian,* 892 F.2d at 680, 683 ("Indeed what securities lawyers call 'loss causation' *is* the standard common law fraud rule (on which see Prosser and Keeton on the Law of Torts § 110, at p. 767 (5th ed.1984)), merely borrowed for use in federal securities fraud cases.").

 In the present case, the district court determined that the SIPC and the trustees did not show a sufficient causal connection between Holmes' acts and the losses they sought to recover. Summary judgment was granted in favor of Holmes on this basis. However, the district court also concluded that there was a genuine issue for trial as to whether Holmes participated in a conspiracy to manipulate the shares of the subject companies. Given this conclusion, the SIPC and the trustees, and the Securities and Exchange Commission in an amicus brief, argue that it was error for the district court to examine Holmes' conduct in isolation from the conduct of his coconspirators. We agree.

"All conspirators are liable for the acts of their co-conspirators." *Beltz Travel Serv. v. International Air Transp. Ass'n,* 620 F.2d 1360, 1367 (9th Cir.1980). "[A] conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *United States v. Patten,* 226 U.S. 525, 544, 33 S.Ct. 141, 145, 57 L.Ed. 333 (1913).

"Dismembering" the conspiracy seems to be what the district court did. In its conclusions of law, the district court stated:

3. The actions of Joe Lugo ("Lugo") [the chief financial officer of FSSC and an alleged coconspirator] constituted supervening events which interrupted any alleged causal chain between Holmes' conduct and FSSC's net capital deficiency.

4. The actions of Rodger Garrity and other Sebag brokers constituted supervening events which interrupted any alleged causal chain between Holmes' conduct and Sebag's net capital deficiency.

5. Plaintiffs' losses were caused by the actions of Lugo and the Sebag brokers.

. . . . .

10. Holmes is not legally responsible for Lugo's decision to not repay Nettie Vigman [an alleged coconspirator] from the monies earned from the resale of her shares of Aero Systems to other brokers, and for his subsequent decision to borrow money instead of to sell inventory to repay her.

11. Holmes is not legally responsible for the decisions of Lugo and the Sebag brokers to pledge Aero Systems stock as collateral for loans.

12. Holmes is not legally responsible for the decisions of Lugo and the Sebag brokers to use funds they allegedly earned from selling Aero Systems stock for improper purposes.

If Holmes conspired with these codefendants, and if the codefendants caused the alleged injuries, then Holmes is legally re-

---

**6.** As with the term "loss causation," there also appears to be a lack of universal happiness with the term "proximate cause."

"Proximate cause"—in itself an unfortunate term—is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct. In a philosophical sense, the consequences of an act go forward to eternity, and

the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would "set society on edge and fill the courts with endless litigation."

Prosser and Keeton on Torts § 41 at 264 (5th ed.1984) (quoting Mitchell, J., in *North v. Johnson,* 58 Minn. 242, 59 N.W. 1012 (1984)).

sponsible. He need not have participated in every detail of the conspiracy. *See Beltz*, 620 F.2d at 1367. Thus, if the district court properly concluded that there was a genuine issue as to whether Holmes conspired to violate RICO, the district court erred in granting Holmes' motion for summary judgment based on a conclusion that his conduct alone did not proximately cause the injuries alleged.

■ In an attempt to avoid this result, Holmes argues the district court erred in determining that a genuine issue of material fact existed as to whether he participated in a conspiracy to violate RICO. The district court based its determination on the declarations of two experts and a summary of the evidence contained in a "statement of background and facts" detailing how Holmes allegedly conspired with Lugo, Seymour Vigman [an officer, a shareholder, and the executive committee chairman of Bunnington], and others to manipulate the stock prices of Aero and Bunnington.

Holmes contends that the experts' declarations refer to documents not attached to or identified in the declarations. He also argues that the declarations contain the experts' opinions and conclusions regarding ultimate issues of fact and legal principles.

The district court's decision to consider the experts' declarations was an evidentiary decision. Evidentiary decisions are reviewed for abuse of discretion. *Kisor v. Johns–Manville Corp.*, 783 F.2d 1337, 1340 (9th Cir.1986). A district court has broad discretion in admitting expert testimony, and its decision will be sustained unless it is manifestly erroneous. *Taylor v. Burlington N. R.R.*, 787 F.2d 1309, 1315 (9th Cir.1986).

The Federal Rules of Evidence permit experts wide latitude in the scope and substance of their testimony. Rules 702 and 704 allow an expert to testify in the form of an opinion, even if it is on an ultimate issue of fact, if the expert's specialized knowledge may assist the trier of fact. Rule 703 allows an expert to base an opinion on facts made known to the expert before or at the hearing, and the facts need not be admissible in evidence so long as they are the type reasonably relied upon by experts in the field. Rule 705 permits an expert to give opinion testimony without prior disclosure of the underlying facts, unless the court requires otherwise.

Here, Holmes makes no argument that the experts do not have the specialized knowledge of the securities industry necessary to assist the trier of fact. *Cf. Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 530 (9th Cir.1986) (introduction of expert testimony is essential to assist the jury in a churning case). Holmes claims that the two experts included opinions as to ultimate issues of fact, but does not claim that the experts failed to explain how they arrived at these conclusions. *Cf. Bieghler v. Kleppe*, 633 F.2d 531, 533 (9th Cir.1980) (expert's affidavit gave more than a bare conclusion that defendants had been negligent and that this negligence caused the accident). Further, an expert is not required to disclose all of the facts underlying an opinion, including documents the expert has reviewed, unless a court so requires. *See Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1318 (9th Cir.1985) (per curiam). We conclude that the district court did not abuse its discretion in considering the experts' declarations.

■ Holmes also challenges under Rule 56(e) the district court's consideration of the SIPC's and the trustees' "statement of background and facts," claiming that it is full of unsupported allegations. However, Rule 56(e) only governs affidavits.[7] The challenged statement consists of a set of allegations that the SIPC and the trustees contend are supported by the declarations of the two experts and by a number of exhibits. The statement is not evidence,

---

7. Rule 56(e) provides:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

Fed.R.Civ.P. 56(e).

but instead is a guide to evidence presented to the court to assist it in considering the evidence in opposition to Holmes' motion for summary judgment. As such, the statement is not objectionable under Rule 56(e).

## CONCLUSION

We conclude that the district court erred in applying the purchaser-seller standing limitation to the SIPC's RICO claim. We also conclude that the district court erred in granting summary judgment to Holmes because genuine issues exist as to whether Holmes participated in a conspiracy and whether the conspirators caused the harm alleged. The district court did not err in considering the experts' declarations as evidence or in using the statement of background and facts as a guide to the evidence.

We reverse the district court's grant of summary judgment, and remand this case to the district court for further proceedings consistent with this opinion.

REVERSED and REMANDED.

